UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEREMY TREICHEL,

      Plaintiff,                        Civil Action No. 16-CV-10331

vs.                                  HON. BERNARD A. FRIEDMAN

CAROLYN W. COLVIN,
ACTING COMMISSIONER
OF SOCIAL SECURITY,

      Defendant.

_____/

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
AND REMANDING FOR FURTHER PROCEEDINGS**

      This matter is presently before the Court on cross motions for summary judgment [docket entries 11 and 13]. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide these motions without a hearing. For the reasons stated below, the Court shall grant plaintiff's motion, deny defendant's motion, and remand the case for further proceedings.

*Background*

      Plaintiff has brought this action under 42 U.S.C. § 405(g) to challenge defendant's final decision denying his application for Social Security disability insurance benefits. An Administrative Law Judge ("ALJ") held a hearing in May 2013 (Tr. 79-120) and issued a decision denying benefits in August 2013 (Tr. 138-54). In November 2013 the Appeals Council found a number of errors in the ALJ's decision and remanded the matter for further proceedings (Tr. 159-62).[1] The ALJ held a second hearing in March 2014 (Tr. 35-75) and he issued a second decision

_____

[1] Specifically, the Appeals Council found that the ALJ did not adequately consider the opinions of Drs. Lombardo or Douglass or the statements of plaintiff's wife regarding plaintiff's

denying benefits in May 2014 (Tr. 13-27).  This became defendant's final decision in November 2015 when the Appeals Council denied plaintiff's request for review (Tr. 1-4).

Under § 405(g), the issue before the Court is whether the ALJ's decision is supported by substantial evidence, which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938).  In making this determination the Court does not review the record de novo, and it may not weigh the evidence or make credibility findings.  If supported by substantial evidence, defendant's decision must be upheld even if substantial evidence would have supported a contrary decision and even if the Court may have decided the case differently in the first instance. *See Engebrecht v. Comm'r of Soc. Sec.*, 572 F. App'x 392, 396 (6th Cir. 2014).

At the time of his March 2014 hearing, plaintiff was 31 years old.  He has a college education and work experience as a grocery store bagger and cashier, Army soldier, account manager, security guard, and part-time computer technician (Tr. 37, 41-44, 85-89, 107, 310). Plaintiff claims he has been disabled since May 2012 (Tr. 72, 283) due to post traumatic stress disorder ("PTSD"), kidney disease, fatigue, sleeplessness, nightmares, panic attacks, anger problems, arthritis, gout, back pain, ankle pain, depression, and anxiety (Tr. 45-48, 89-94, 98-99, 103-04, 288).  His insured status expired in December 2012 (Tr. 16, 262).

The ALJ found that plaintiff's severe impairments are "back strain, degenerative processes in the ankle, obesity, depression, anxiety disorder, and posttraumatic stress disorder" (Tr. 18) and that his non-severe impairments are "insomnia, polycystic kidney disease, hearing loss, and

---

inability to get along with authority figures, and that he did not adequately evaluate plaintiff's mental residual functional capacity (Tr. 160-61).

sleep apnea" (Tr. 20).  The ALJ found that plaintiff cannot perform his past work, but that he has

the residual functional capacity ("RFC") to perform

> light work . . . except that he could never climb ladders, ropes, or
> scaffolds and had to avoid exposure to hazards such as heights and
> machinery with moving parts.  The claimant could only have
> occasional contact with coworkers, supervisors, and the general
> public. He could only do simple, routine, repetitive work that did not
> involve a production rate pace.  The claimant could have only
> occasional changes in a routine work place setting and was likely to
> be off task 8% of the work period.

(Tr. 22.)  A vocational expert ("VE") testified in response to a hypothetical question that a person

of plaintiff's age, education, and work experience, and who has this RFC, could do certain unskilled

light level work as an assembler, line attendant or packager (Tr. 68).  Citing this testimony as

evidence that work exists in significant numbers that plaintiff could perform, the ALJ concluded that

plaintiff is not disabled (Tr. 27).

Having reviewed the administrative record and the parties' briefs, the Court

concludes  that the ALJ's decision in this matter is not supported by substantial evidence because

his RFC evaluation of plaintiff is flawed for the reasons explained below.  Since the hypothetical

question incorporated this flawed RFC evaluation, it failed to describe plaintiff accurately in all

relevant respects and the VE's testimony given in response thereto cannot be used to carry

defendant's burden to prove the existence of a significant number of jobs plaintiff is capable of

performing.

### The ALJ's Failure to Consider the VA's Disability Decision

The first flaw in the RFC determination lies in the ALJ's failure to consider, and to

adequately explain why he gave no weight to, the decision of the Department of Veterans Affairs

("VA") awarding plaintiff disability benefits on the grounds that he has been deemed by that agency

to be completely and totally disabled (Tr. 24).  In his August 2013 decision, the ALJ noted that plaintiff "indicated that he has achieved a 100 percent service-connected disability through the [VA] as of August 25, 2011" (Tr. 149, citing Tr. 368 and 729), but he gave the VA's decision "little weight" because (1) plaintiff "failed to submit this service connected disability decision," and (2) the VA's "finding is not based on Agency policy or definitions of disability" (Tr. 149).  In fact, however, the VA's decision, dated November 30, 2012, *was* included in the record as Ex. 8E (Tr. 343-49); the ALJ simply overlooked or disregarded it.  In his May 15, 2014, post-remand decision, the ALJ again overlooked or disregarded Ex. 8E, but he noted a more recently submitted VA document "indicating that the claimant is considered by the VA to be totally and permanently disabled due to a service-connected disability (Exhibit 10F)" (Tr. 24, citing Tr. 744-45).  However, Exhibit 10F is not the VA's disability decision, but a December 2, 2013, letter from the VA summarizing the benefits plaintiff currently receives, i.e., VA disability benefits based on that agency's determination that plaintiff is "totally and permanently disabled due to your service-connected disabilities" (Tr. 744).  The ALJ gave this reference to the decision no weight because it "is not accompanied by any medical analysis and therefore provides nothing to be considered" (Tr. 24).

The ALJ erred by failing to acknowledge and consider the VA's November 30, 2012, "rating decision," granting plaintiff "entitlement to the 100% rate effective August 25, 2011, because you are unable to work due to your service connected disability/disabilities" (Tr. 344).  As the ALJ noted, but unfortunately did not do, "determinations of disability by other governmental agencies are to be considered" (Tr. 24).  Defendant apparently concedes that the ALJ must consider the VA's disability determination, as she has cited *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 510 (6th

4

Cir. 2013), which noted that, while not binding, "[w]e have held that a disability rating from the [VA] is entitled to consideration, but we have not specified the weight such a determination should carry when determining social security disability eligibility." In the present case, it appears that the ALJ was unaware of and did not consider the VA's November 30, 2012, rating decision that plaintiff was disabled and unable to work as of August 25, 2011. On remand, the ALJ must consider this decision[2] and, as necessary, adjust his RFC determination and put revised hypothetical questions to the VE.

### *The ALJ's Characterization of Plaintiff's Insomnia and Kidney Disease as Non-Severe Impairments*

The second flaw in the RFC determination lies in the ALJ's characterization of plaintiff's insomnia and kidney disease as a non-severe impairment (Tr. 20). An impairment is non-severe "if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521. The ALJ did not explain why he found plaintiff's insomnia to be non-severe, and such a finding is not supported by the record.[3] Further, "[o]nce one severe impairment is found, the combined effect of all impairments must be considered, even if other impairments would not be severe." *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009). Therefore, even if

---

[2] This is also required by Social Security Ruling ("SSR") 06-03p, as noted below. *See infra* p. 17.

[3] Plaintiff's insomnia is well documented in his medical records. *See, e.g.,* Tr. 444 (Mary Daly, MSN: "Insomnia"); Tr. 449 (Dr. Rao: "His psychiatric problems are mainly insomnia all the time and nightmares . . ."); Tr. 525 (Dr. Malloy: "Insomnia"); Tr. 570, 573 (Dr. Dietzel: "insomnia"); Tr. 594 (progress note from plaintiff's hospitalization for PTSD identifying "sleep disturbance" as one of his symptoms); Tr. 722 (Dr. Lombardo: "nightmares and insomnia result in poor sleep, which results in daytime fatigue"); Tr. 732 (Dr. Nims: "Severe insomnia"). Plaintiff testified that his insomnia is one reason he believes he cannot work, as he is exhausted, cannot concentrate, and must take daily naps. *See infra.* As noted below, the ALJ offered no supportable reason for disbelieving plaintiff's testimony.

plaintiff's insomnia by itself were non-severe, the ALJ erred by not considering it along with plaintiff's severe impairments in assessing plaintiff's RFC. On remand, the ALJ must reevaluate the severity of plaintiff's insomnia and, as necessary, adjust his RFC assessment of plaintiff and put revised hypothetical questions to the VE.

The ALJ likewise erred in failing to consider the importance of the fact that plaintiff's polycystic kidney disease prevents him from taking any medication for his insomnia or to control his PTSD symptoms. While the kidney disease itself may be non-severe, this consequence of the disease appears to be quite severe indeed. On remand, the ALJ must consider the severity of plaintiff's kidney disease as it affects plaintiff's ability to take medication, make findings as to the effect this has on plaintiff's insomnia and PTSD symptoms, and, as necessary, revise his RFC assessment and hypothetical questions to the VE.

### The ALJ's Assessment of Plaintiff's Credibility

The third flaw in the RFC determination lies in the ALJ's failure to explain sufficiently why he discounted plaintiff's testimony, particularly regarding two aspects of his medical condition – namely (1) the extent to which his insomnia reduces his concentration and requires him to nap during the day and (2) the extent to which his other PTSD symptoms (including anxiety, panic attacks, and paranoia) interfere with his ability to work. Regarding his insomnia, plaintiff testified that he is unable to fall asleep for hours, that he is "always waking . . . up in the middle of the night," that he has nightmares three to five times per week, that he generally sleeps between three and four and one-half hours per night, and that as a result he is exhausted, cannot concentrate, and has to take one or two 30-60 minute naps per day (Tr. 45-47, 54, 56-57, 59, 69-70, 90-93, 98-99, 102-03, 110, 118-19). Regarding his PTSD, which has been diagnosed as arising from

6

his combat service in Iraq in 2003, plaintiff testified that, in addition to insomnia, he has panic attacks, anxiety, depression, paranoia, is irritable, is uncomfortable around people, feels unsafe, cannot concentrate, is "hypervigilant," and has anger problems (Tr. 46, 49-52, 63-65, 101, 103-05, 107-09). He also described experiencing "blackout" episodes when "my mind kind of leaves my body" (Tr. 51). Plaintiff testified that due to his kidney disease he cannot take any medication for his insomnia or his PTSD (Tr. 39, 47, 49, 91, 93, 106), that his attempts to work since being discharged from the Army have been unsuccessful[4] (Tr. 107-08), and that he was not aware of the severity of his symptoms until his wife left him in 2011 (Tr. 43-44). Plaintiff testified that his PTSD prevents him from working because he cannot sleep well, which has lessened his ability to concentrate and "do a job efficient[ly]" and requires him to nap daily, and because he has anxiety and panic attacks (Tr. 45-47, 50-57, 103-06, 110). The VE testified that if a person needs to take unscheduled breaks lasting one to two hours per day, this would "eliminate competitive work" (Tr. 115).

While "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, . . . [n]evertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). In the present case, the ALJ offered essentially two reasons for discounting plaintiff's testimony, neither of which is supported by substantial evidence. First, the ALJ pointed to the function reports completed by plaintiff and his wife in July 2012 (Tr. 299-306, 322-29) and found

---

[4] Plaintiff testified that he quit an account management job because he had difficulty concentrating and getting along with the staff (Tr. 107) and that he quit a job as security officer because "the air compressors would make a big loud sound, and it would startle me and throw me into a panic mode" (Tr. 108). Plaintiff held the account manager job from March to June 2006 and the security officer job from January to September 2008 (Tr. 310).

that they show "a much higher level of daily activity . . . than would be expected of an individual who has the physical and psychological limitations now alleged by the claimant in his testimony" (Tr. 23).  Certainly, if plaintiff or his wife reported activities that contradicted those to which plaintiff testified, the ALJ would have a reasonable basis for discounting plaintiff's testimony.  Yet the ALJ points to no such contradiction. Plaintiff reported that he feeds his children with his wife's help, prepares daily "easy meals nothing complicated," mows his grass with a riding mower once per week for two hours, takes trash to the dump once per week for 30 minutes, goes shopping once per week for two to three hours, watches television, plays games, "chats," is "unable to talk to strangers I feel threaten[ed]," and is "unable to socialize [due] to isolation issues" (Tr. 323-25). Plaintiff's wife reported that she and plaintiff "spend 24/7 together.  We go out to eat with our 3 children and watch T.V. together," and that plaintiff "takes care of the kids feed [sic] them, gives them bath[]s," "feeds [pets] and takes them outside," cares for the pets with her help, spends two hours daily preparing meals ("sandwiches, frozen dinners, can food, complete meals with several courses"), mows the grass using a riding lawn mower, takes out the trash, goes grocery shopping once per week for two to three hours, watches television, plays video games, spends time with their children, and goes out to eat two to three times per month (Tr. 299-303).  The ALJ does not explain how these minimal activities are inconsistent with plaintiff's testimony or how his ability to do these things demonstrates his ability to work full time.

The ALJ also found that plaintiff's credibility was diminished because "there is a notation made in the medical record in April 2012 . . . that he was unemployed and looking for work" (Tr. 23; *see also* 152).  The notation at issue ("Current Vocational Status: Unemployed looking for work," *see* Tr. 522), by Dr. Malloy who was evaluating plaintiff for a possible traumatic

8

brain injury on April 11, 2012, is unexplained and the ALJ did not question plaintiff about it at either of his hearings.  Most significantly, the ALJ either overlooked or disregarded the notations in the record indicating that when he was examined by Dr. Malloy plaintiff was taking prescription medications for anxiety and depression (Alprazolam and Mirtazapine) (Tr. 523), but that shortly *thereafter* plaintiff stopped taking any medications for his PTSD symptoms because of his kidney disease (Tr. 47, 65, 507, 660, 668, 815).  No reasonable fact-finder could conclude, as the ALJ did, that plaintiff's testimony regarding his PTSD symptoms from May 2012 onward (when he was no longer on medication) should be discounted because he was "looking for work" in April 2012 while on medication.

        For similar reasons, it was unreasonable for the ALJ to discount plaintiff's testimony regarding the severity of his PTSD symptoms on the grounds that "he was able to complete his schoolwork successfully but left the program when he felt that his anger would be too much of an issue for him to teach" (Tr. 21, first and third paragraphs).  Plaintiff testified that he received a bachelor's degree in network security in April 2012 (Tr. 37-38, 59).  He also testified that his college program was sheltered: "some of the instructors were military veterans, and the classes were . . . five to eight people per class, and the majority of them that were in my class were veterans that served in Iraq also"; the campus "wasn't that big . . . there wasn't that many people there, and the majority of the people are actually military veterans who I feel safe around"; time in class "was only like an hour a day" and three to four days per week; and most of the classwork he could do at home (Tr. 59-61, 83, 104, 105, 109).  Plaintiff's ability to function in such a sheltered environment until April 2012 while on medication says little, if anything, about his ability to function from May 2012 onward without medication.  Also, the ALJ erred factually in stating that plaintiff "left the program

when he felt that his anger would be too much of an issue for him to teach" (Tr. 21, first and third

paragraphs).  In fact, plaintiff testified that

> A. The plan they had in force was I was supposed to go through and do a master's program, and after being seen at the VA for my symptoms for PTSD and stuff and knowing that I can't take medication, they decided to drop me out of the program all together, because they said I wouldn't be able to go any farther, and that – and that's when the VA issued the 100 percent IU individual unemployability.
>
> Q. Did they tell you specifically why they dropped you from the program?
>
> A. Yeah, because the symptoms were intense, and that they were afraid that I wouldn't be able to handle working in those situations.
>
> Q. And what situations do you think they were referring to, if you know?
>
> A. For instance, like teaching with a master's degree, they were afraid that I would actually hit a student, because the had [sic] the anger issues and –

(Tr. 61-62.)

For these reasons, the Court concludes that the ALJ's adverse credibility finding is

not supported by substantial evidence.  On remand, the ALJ must reassess plaintiff's credibility,

particularly as regards his testimony concerning his insomnia and PTSD symptoms and, as

necessary, adjust his RFC evaluation of plaintiff and put revised hypothetical questions to the VE.

***The ALJ's Evaluation of the Medical Evidence***

The fourth flaw in the RFC determination lies in the ALJ's failure to adequately

explain his evaluation of the medical evidence.  In particular, the ALJ failed to offer a reasonable

explanation for giving significant weight to the opinion of a non-examining consultant (Dr.

Douglass) but little or no weight to the opinions of other mental health care professionals who

10

examined plaintiff and, in the case of therapist Susan Meade, treated plaintiff regularly over an extended period of time.

As summarized below, the particularly relevant evidence of plaintiff's mental condition comes from Dr. Malloy, notes from plaintiff's hospitalization for PTSD, Dr. Douglass, therapist Susan Meade, and Dr. Lombardo.

In April 2012 plaintiff was examined by Dr. Dennis Malloy, M.D., for a possible traumatic brain injury ("TBI") (Tr. 523). Dr. Malloy was "inclined to believe this is not a TBI," but did diagnose "severe PTSD" and noted symptoms of "overeating, anger bursts, nightmares, and night terrors, generalized anxiety" (Tr. 523). Dr. Malloy indicated plaintiff's PTSD is "[n]ot well controlled" and that he also has depression, general anxiety disorder, insomnia, and sleep apnea (Tr. 524-25). Dr. Malloy noted "severe" or "very severe" symptoms in the following areas: vision problems, hearing difficulty, numbness or tingling, loss of appetite, poor concentration, forgetfulness, difficulty making decisions, slowed thinking, fatigue, difficulty falling or staying asleep, feeling anxious or tense, feeling depressed or sad, irritability, and poor frustration tolerance (Tr. 521). He characterized plaintiff's PTSD as "severe" and "[n]ot well controlled" (Tr. 523, 525).

From June 21 to July 13, 2012, plaintiff participated in an in-patient residential PTSD program at a VA facility in Battle Creek, Michigan (Tr. 563, 588).[5] He was discharged with diagnoses of "PTSD and mood disorder with depression and anxiety" (Tr. 563, 600, 686). He "participated in all ward group and individual therapy related to PTSD including anger management, group and individual PTSD/CPT, moving relaxation techniques, and nutritional education" (Tr.

---

[5] Oddly, the ALJ at first acknowledged that plaintiff "was once hospitalized for 30 days due to panic attacks" (Tr. 19), but later asserted that plaintiff "has never been psychiatrically hospitalized" (Tr. 22).

564).  Plaintiff's final weekly progress note indicates that his "symptoms appear to be lessening" and that he "can be maintained on an outpatient basis at this time" (Tr. 594).

On October 1, 2012, Bruce Douglass, Ph.D., prepared a mental RFC assessment of plaintiff for the Disability Determination Service ("DDS") (Tr. 132-33).  Dr. Douglass concluded that plaintiff "retains the capacity to perform routine, 2-step tasks on a sustained basis," despite moderate to marked limitations in his ability to understand and remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to maintain a schedule, to sustain an ordinary routine, to work with or in proximity to others, to complete a normal workday without interruptions from psychologically based symptoms or perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, and to get along with others without exhibiting behavioral extremes (Tr. 133).

After being discharged from the Battle Creek program, plaintiff continued seeing a therapist, Susan Meade, LMSW, who had begun treating plaintiff in February 2012 (Tr. 758).  On a Mental Impairment Questionnaire dated February 13, 2014, Ms. Meade noted diagnoses of anxiety disorder, PTSD chronic, and major depressive disorder recurrent (Tr. 756).  She indicated that plaintiff has "no useful ability to function" in various work-related areas, including remembering and carrying out instructions, maintaining attendance and attention, working with others, making decisions, completing a normal workday, and dealing with normal work stress (Tr. 757-58).  She commented that plaintiff "is being treated for PTSD as evidenced by the following[:] anger/rage, emotional numbness, trouble sleeping, is isolated, avoids people & activities, increased anxiety/worry, poor concentration, hypervigilance, nightmares, flashbacks" (Tr. 757).  Ms. Meade

also commented that "cognitive deficits, memory is poor. Client is unable to tolerate stress, can't be with people, has flashbacks, angry outbursts, startle response, hypervigilance, anxiety" (Tr. 758).

In July 2013, plaintiff was examined by Dr. Jennifer Lombardo, a licensed psychologist, at the request of the DDS (Tr. 718-26). She noted the symptoms documented elsewhere in the record, including nightmares, insomnia, hypervigilance, flashbacks, and depression (Tr. 718). The summary section of her report states:

> . . . Claimant experienced combat while serving in the military. He currently has intrusive thoughts and memories of experiences from the military, experiences flashbacks and nightmares, dissociates, feels numb, is hypervigilant and easily angered, and has insomnia. He feels unsafe in crowds, repetitively checks locks on doors at night, and has panic attacks, triggered by various noises or sounds that remind him of his military experiences. . . . Current symptoms of depression include anhedonia, decreased appetite, difficulty concentrating, poor self-esteem, insomnia, racing thoughts, and feelings of worthlessness and hopelessness. His symptom report is consistent with diagnoses of PTSD and major depressive disorder. . . . He reportedly cannot take medication for the PTSD due to kidney disease. . . .
>
> Claimant's mental health symptoms are likely to make it difficult for him to maintain full-time employment. Claimant is uncomfortable in crowds, and being in crowds triggers panic attacks, which would limit his ability to work with groups of people. Working alone is also likely to be problematic, as panic attacks are also triggered by noises that are interpreted as possible threats to his safety. He is likely to have interpersonal difficulties due to poorly controlled anger, which suggests he may not respond appropriately to feedback from supervisors. Finally, nightmares and insomnia result in poor sleep, which results in daytime fatigue, which is likely to hinder his ability to concentrate, creating deficits in claimant's ability to remember and carry out instructions. Further impeding his concentration, memory, and follow-through are intrusive thoughts and flashbacks of his military experiences.

(Tr. 722.) Dr. Lombardo completed a Medical Source Statement form on which she indicated that plaintiff would have moderate difficulty understanding and remembering simple instructions and

13

making judgments on complex work-related decisions; and that he would have marked difficulty carrying out simple instructions and in understanding, remembering, and carrying out complex instructions (Tr. 724). Dr. Lombardo also indicated that plaintiff would have moderate difficulty interacting appropriately with the public and in responding appropriately to usual work situations and to changes in a routine work setting; and that he would have marked difficulty interacting appropriately with supervisors and co-workers (Tr. 725).

Also at the request of the DDS, plaintiff was subjected to an internal medicine examination in July 2013 by Dr. Harold Nims, D.O. (Tr. 728-42). Dr. Nims concluded that plaintiff "apparently has a significant problem with post-traumatic stress disorder," but that from a physical standpoint plaintiff has no impairments that would preclude light-level work (Tr. 732, 737-38).

In his evaluation of the evidence regarding the severity of plaintiff's PTSD, the ALJ gave at first "some weight" (Tr. 151) and then "significant weight" (Tr. 25) to the opinion of Dr. Douglass; "little weight" (Tr. 151) and "only partial weight" (Tr. 25) to the opinion of Dr. Lombardo; and "very little weight" to the opinion of plaintiff's psychotherapist, Susan Meade (Tr. 24). The ALJ did not adequately explain his reasons for weighing the evidence in this fashion. Dr. Douglass, apparently a Ph.D. psychologist (Tr. 20, 128), did not examine plaintiff and did not have the benefit of the notes and opinion from plaintiff's therapist, Susan Meade, from October 1, 2012, onward or the October 26, 2012, report of Dr. Beltran (Tr. 661-63) or the July 2013 report of Dr. Lombardo (Tr. 718-26). Most significantly, it is not apparent that Dr. Douglass was aware that plaintiff stopped taking medications for his insomnia and PTSD symptoms in mid-2012. While noting a medical record dated May 8, 2012, stating that plaintiff "[h]ad to stop taking psychotropic meds due to affecting his kidney disease," Dr. Douglass then cited a medical record dated May 21,

14

2012, indicating that plaintiff "was to begin Paxil and trazodone" and under "ADLs" he wrote that plaintiff "needs no reminders of grooming *or to take meds*" (Tr. 127) (emphasis added).   If, as it appears, Dr. Douglass was under the mistaken impression that plaintiff continued taking antidepressant medications after mid-2012, the ALJ erred by giving his opinion any weight, to say nothing of "significant weight."   On remand, the ALJ must reassess Dr. Douglass' report and determine the weight, if any, it deserves.

The ALJ next erred in failing to explain the weight, if any, he gave to the findings of Dr. Malloy.   The ALJ's second (post-remand) decision did not mention Dr. Malloy, but it did incorporate by reference the summary of the medical evidence in the first (pre-remand) decision, where the ALJ stated:

> In April 2012, the claimant saw Dennis J. Malloy, M.D., for an evaluation.   He noted the claimant appears to have severe post-traumatic stress disorder, angry bursts, nightmares, and night terrors (4F/67).   Dr. Mallo[]y noted the claimant had generally normal concentration (4F/68).   He diagnosed the claimant with depression, post-traumatic stress disorder, and anxiety disorder (4F/68).

(Tr. 150, citing Tr. 523-24.)  This summary of Dr. Malloy's findings is inaccurate.  As noted above, Dr. Malloy found plaintiff's PTSD to be "severe" and "[n]ot well controlled" and accompanied by a long list of severe or very severe symptoms.   There is no suggestion at the cited page that plaintiff "had generally normal concentration."   At page 68 of Exhibit 4F (Tr. 524), the only mention of plaintiff's concentration is that he was "[a]ble to spell WORLD backward."   Indeed, in the same report Dr. Malloy noted that plaintiff's "[p]oor concentration" was "[v]ery severe" (Tr. 521).   On remand, the ALJ must review the entirety of Dr. Malloy's report and reevaluate the weight it deserves.

The ALJ next erred by failing to offer supportable reasons for giving the answers

15

provided by Ms. Meade to a mental impairment questionnaire "very little weight" (Tr. 24). The ALJ

offered these reasons:

> Ms. Meade listed a GAF of 55 and checked off a series of boxes indicating that the claimant has no useful ability to function in virtually any area (Exhibit 12F). Her indication of such significant restrictions is completely inconsistent with a GAF of 55, which is reflective of only moderate symptomatology, and it is unsupported by the overall medical record. Moreover, as a social worker Ms. Meade is not a qualified medical source and her opinion is not entitled to the weight that is given to such sources. Given its internal inconsistency and lack of support from the record, her mental impairment questionnaire is given very little weight.

(Tr. 24, citing Tr. 756-58.) These statements are perplexing. A GAF score between 41 and 50

represents "Serious symptoms (e.g.. suicidal ideation, severe obsessional rituals, frequent

shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no

friends, unable to keep a job)," while a score between 51 and 60 represents "Moderate symptoms

(e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in

social, occupational, or school functioning (e.g.. few friends, conflicts with peers or co-workers)."

*See* https://msu.edu/course/sw/840/stocks/pack/axisv.pdf (visited July 27, 2016). The ALJ does not

explain how Ms. Meade's assignment of GAF scores of 55 and 53 (Tr. 756) is "completely

inconsistent" with the severe restrictions she indicated in answering the questionnaire.

It is unclear whether the ALJ was referring to Ms. Meade's "indication of such

significant restrictions" or the GAF score of 55 when he stated that "it is unsupported by the overall

medical record," but his statement is not supported by substantial evidence either way. Similar

GAF scores appear elsewhere in the record from other mental healthcare professionals from the

relevant time period. *See* Tr. 500 (53), Tr. 537 (53), Tr. 563 (50), Tr. 577 (50), Tr. 594 (50/52), Tr.

600 (50), Tr. 687 (50), and Tr. 723 (48). If the ALJ meant that it is the restrictions suggested by Ms.

16

Meade which are "unsupported by the overall medical," he must support the statement with some semblance of analysis.  It is certainly not self-evident that support for her restrictions is generally lacking.  As noted above, Dr. Malloy characterized plaintiff's PTSD as severe and not well controlled and noted the presence of several severe or very severe symptoms; and Dr. Lombardo made similar findings and doubted plaintiff could maintain full-time employment. Dr. Joel Beltran, D.O., who conducted a neurology consultation in October 2012 for plaintiff's blackout spells, likewise found that plaintiff's PTSD was "uncontrolled at this time" and "apparently is worsening" (Tr. 663).  In any event, the ALJ must do more than simply assert that Ms. Meade's restrictions are unsupported by the medical record.

The ALJ's final reason for giving Ms. Meade's questionnaire answers "very little weight" is that she "is not a qualified medical source and her opinion is not entitled to the weight that is given to such sources."  This statement, while true, does not justify dismissing Ms. Meade's suggested restrictions outright.  To the contrary, under SSR 06-03p the  ALJ must "consider all of the available evidence in the individual's case record," including opinions from licensed clinical social workers.  This Ruling states:

> In accordance with sections 223(d)(5) and 1614(a)(3)(H) of the Act, when we make a determination or decision of disability, we will consider all of the available evidence in the individual's case record. This includes, but is not limited to, objective medical evidence; other evidence from medical sources, including their opinions; statements by the individual and others about the impairment(s) and how it affects the individual's functioning; information from other "non-medical sources" and decisions by other governmental and nongovernmental agencies about whether an individual is disabled or blind. See 20 CFR 404.1512 and 416.912.

*   *   *

With the growth of managed health care in recent years and the

17

> emphasis on containing medical costs, medical sources who are not
> "acceptable medical sources," such as nurse practitioners, physician
> assistants, and licensed clinical social workers, have increasingly
> assumed a greater percentage of the treatment and evaluation
> functions previously handled primarily by physicians and
> psychologists. Opinions from these medical sources, who are not
> technically deemed "acceptable medical sources" under our rules, are
> important and should be evaluated on key issues such as impairment
> severity and functional effects, along with the other relevant evidence
> in the file.

SSR 06-03p, available at: https://www.ssa.gov/OP_Home/rulings/di/01/SSR2006-03-di-01.html

(visited July 27, 2016).  The ALJ plainly erred in dismissing Ms. Meade's findings and opinions on

the grounds that she "is not a qualified medical source."

On remand, the ALJ must reevaluate the restrictions suggested by Ms. Meade (in

conjunction with her extensive progress notes) in light of the entire record and explain his reasons

for giving them whatever weight they deserve.

Finally, the ALJ failed to explain adequately why he gave "only partial weight" (Tr.

25) to the findings of Dr. Lombardo.  His explanation for doing so is as follows:

> It is noted that this examination took place eight months after the
> claimant last had insured status, and that in the intervening time the
> claimant had received the fairly positive report from the VA
> described in the above paragraph.  Moreover, the claimant and his
> wife described a level of daily functioning in July 2012 that was
> indicative of much higher functional capabilities at that time than
> were described by Dr. Lombardo as of August 2013.  Because of
> these factors, the findings made by Dr. Lombardo based upon a one-
> time examination of the claimant well after the date last insured are
> given only partial weight.

(Tr. 25.)  This explanation is unsupportable.  The mere fact that Dr. Lombardo examined plaintiff

18

seven months[6] after his insured status expired does not render her findings and opinions irrelevant. "[M]edical evidence that postdates the insured status date may be, and ought to be, considered, insofar as it bears on the claimant's condition prior to the expiration of insured status." *Anderson v. Comm'r of Soc. Sec.*, 440 F. Supp. 2d 696, 699 (E.D. Mich. 2006). Further, there is no basis for the ALJ's assertion that "in the intervening time" (i.e., from December 31, 2012, to July 31, 2013) "the claimant had received the fairly positive report from the VA described in the above paragraph." The ALJ's only reference in a preceding paragraph to anything resembling a "positive report from the VA" during this time period is found in the third full paragraph of his decision (Tr. 24) where he stated that "[i]n July 2013 the claimant was described as having good ability to learn and good knowledge of his medical condition, and he verbalized understanding of the intended outcome of the teaching he was receiving (Exhibit 13F, p. 39)." Far from being a "positive report," the cited page and the page preceding are progress notes from Susan Meade, who indicated that plaintiff had a "good" ability to learn about and had good knowledge of PTSD (Tr. 796). It is unfathomable how any reasonable fact-finder could interpret this information as a "positive report" that is somehow inconsistent with Dr. Lombardo's restrictions. More instructive as to plaintiff's progress, or lack thereof, is the following entry from the same session, which the ALJ overlooked or disregarded: "Client reports an angry outburst last weekend after he & his wife had friends at the house. He doesn't want friends to come back again & his anger caused his wife to cry & go into the bedroom with the kids" (Tr. 796).[7]

_____

[6] Plaintiff's insured status expired on December 31, 2012 (Tr. 16) and Dr. Lombardo examined plaintiff on July 31, 2013 (Tr. 718).

[7] Other entries from Susan Meade's notes from this time period further weaken the evidentiary support for the ALJ's suggestion that plaintiff received a "fairly positive report from

The ALJ's next reason for discounting Dr. Lombardo's findings (i.e., that a higher level of daily activities was described in July 2012 than by Dr. Lombardo in July 2013) is illogical. The issue in this case is whether plaintiff was disabled before his insured status expired in December 2012. If the ALJ meant to suggest that plaintiff's condition worsened between July 2012 and July 2013, he may not simply throw out evidence of plaintiff's condition at the later date. Rather, in accordance with *Anderson*, he must determine the extent to which that evidence may be relevant to determining plaintiff's condition on and before expiration of his insured status.

To the extent the ALJ dismissed Dr. Lombardo's findings because they were "based upon a one-time examination," this presents a contradiction for the ALJ to resolve on remand, as the ALJ gave "significant weight" to the opinion of Dr. Douglass who did not examine plaintiff at all.

On remand, the ALJ must reevaluate the medical evidence to correct the errors noted above and, as necessary, revise his RFC assessment of plaintiff and his hypothetical questions to the VE.

The final error in the ALJ's RFC determination lies in his failure to explain his finding that plaintiff "likely . . . would be off task for 8% of a given work day" (Tr. 22, 25). The ALJ included this figure in his first hypothetical question to the VE at the post-remand hearing, in response to which the VE identified jobs the ALJ found plaintiff could perform (Tr. 68). The ALJ offered no explanation for this figure. The VE testified that no jobs exist for a hypothetical worker

---

the VA." For example, on June 12, 2013, Ms. Meade noted: "Client reports he fell asleep at 4 AM this morning and wakened at 7 AM. He naps several times during the day. . . . Client states that when he is around a lot of people 'I want to crawl into a corner & curl up'" (Tr. 798). On July 30, 2013, she noted: "Client sleeps 3-4 hours/night & wakens frequently, he is often depressed & emotionally numb" (Tr. 794). On August 27, 2013, she noted: "Jeremy sleeps 3-4 hours & naps during the day, avoids crowds, had 3 nightmares recently" (Tr. 792).

who is "off task 20 percent of the work period" (Tr. 69) or who must take "unscheduled breaks [lasting] one to two hours a day" (Tr. 115).  One hour in an eight-hour day is 12.5% of the workday.  The 8% figure appears to be nothing more than an arbitrary number slightly below the "unemployability" threshold identified by the VE.  On remand, the ALJ must explain how he arrived at this figure and cite to supporting evidence in the record.

For these reasons, the Court concludes that the ALJ's decision in this matter is not supported by substantial evidence.  Remanding the matter for an award of benefits would not be appropriate at this time because the record, in its current state, is not such that "proof of disability is overwhelming or . . . proof of disability is strong and evidence to the contrary is lacking." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).  Rather, the matter must be remanded so that the record may be further developed to address the deficiencies noted above.  Accordingly,

IT IS ORDERED that defendant's motion for summary judgment is denied.

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment is granted and this matter is remanded for further proceedings to address the errors identified above.  This is a sentence four remand under § 405(g).

<br>

|                          | s/Bernard A. Friedman                          |
|--------------------------|------------------------------------------------|
| Dated: July 28, 2016     | BERNARD A. FRIEDMAN                             |
|    Detroit, Michigan | SENIOR UNITED STATES DISTRICT JUDGE |

## <u>CERTIFICATE OF SERVICE</u>

  The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 28, 2016.

         s/Keisha Jackson   
         KEISHA JACKSON
         Case Manager